**THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| AD HOC SHRIMP TRADE and<br>ENFORCEMENT COMMITTEE,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br>and<br><br>MINH PHU SEAFOOD JOINT STOCK<br>COMPANY and MSEAFOOD CORPORATION,<br><br>    Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**NON-CONFIDENTIAL**
Proprietary Information
Removed from Pages 10, 14,
15, 17, and 31 to 36

Court No. 21-00129

**RESPONSE BRIEF OF DEFENDANT-INTERVENORS MINH PHU SEAFOOD JOINT
STOCK COMPANY and MSEAFOOD CORPORATION IN OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Defendant-Intervenors Minh Phu
Seafood Joint Stock Company and
MSeafood Corporation*

William H. Barringer
3900 Watson Place, N.W.
Washington, D.C. 20016

*Legal Advisor to Minh Phu and MSeafood*

December 3, 2021

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

II.  STATEMENT OF FACTS .................................................................................................... 4

III. SUMMARY OF ARGUMENT ........................................................................................... 19

IV. STANDARD OF REVIEW ................................................................................................. 22

V.  ARGUMENT ....................................................................................................................... 23

   A.  ORR's Determination to Reverse TRLED's Determination of Evasion Was Not
      Arbitrary, Capricious or An Abuse of Discretion ........................................................... 23

     1.  There is no evidence that ORR failed to review the entire record in this case ............ 23

     2.  ORR Properly Characterized the Evidence on the Record ......................................... 23

     3.  ORR correctly determined that the application of adverse inferences to Minh Phu was
        improper and that there was no record evidence of evasion ....................................... 23

       i.   ORR Correctly Determined That It Was Inappropriate To Apply Adverse
           Inferences .......................................................................................................... 23

       ii.  ORR Correctly Determined That It Was Inappropriate To Apply Adverse
           Inferences .......................................................................................................... 36

   B.  Minh Phu's Public Summaries Were In Compliance With Regulatory Requirements ..... 37

VI. CONCLUSION .................................................................................................................... 42

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*F. Ili De Cecco De Filippo Fara S. Martino S.p.A. v. United States,*
    216 F.3d 1027 (Fed. Cir. 2000) ................................................................28

*International Cargo & Surety Ins. Co. v. United States,*
    15 C.I.T. 541 (1991) ................................................................................23

*Maverick Tube Corp. v. United States,*
    37 I.T.R.D. 2829, 2016 WL 703575 (Ct. Int'l Trade 2016) ....................29

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003) ................................................................30

*Olympic Adhesives Inc. v. United States,*
    899 F.2d 1565 (Fed. Cir. 1990) ................................................................29

*Royal Brush v. United States,*
    483 F. Supp. 3d 1294 (Ct. Int'l Trade 2020) .....................................38, 39

*Royal Brush v. United States,*
    Court No. 19-00198 (Ct. Int'l Trade Oct. 29, 2021)...........................39, 40

*Shandong Huarong Gen. Group Corp. v. United States,*
    27 C.I.T. 1568 (Ct. Int'l Trade 2003) ......................................................30

**Statutes**

19 U.S.C. § 1517(c) ........................................................................................28

19 U.S.C. § 1517(c)(1)(A) ..............................................................................22

19 U.S.C. § 1517(f)(1) ....................................................................................22

19 U.S.C. § 1517(g)(2) ...................................................................................22

19 U.S.C. § 1677e...........................................................................................28

**Regulations**

19 C.F.R. § 165.4(a)(2)..............................................................................21, 37

19 C.F.R. § 165.45....................................................................................22, 23

**Other Authorities**

*Certain Frozen and Canned Warmwater Shrimp and Prawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, 69 Fed. Reg. 1,301 (Dep't Commerce Jan. 8, 2004).................................................................................................2

*Notice of Implementation of Determination Under Section 129 of the Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty Order*, 81 Fed. Reg. 47,756 .........................................................................................4

*Notice of Implementation of Determination Under Section 129 of the Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty Order*, 81 Fed. Reg. 47,756 (Dep't Commerce July 22, 2016) .................................................2

Statement of Administrative Action, H.R. Rep. Doc. No. 103-316(1)..........................................28

**THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| AD HOC SHRIMP TRADE and<br>ENFORCEMENT COMMITTEE,<br><br>      Plaintiff,<br><br>      v.<br><br>UNITED STATES,<br><br>      Defendant,<br>  and<br><br>MINH PHU SEAFOOD JOINT STOCK<br>COMPANY and MSEAFOOD CORPORATION,<br><br>      Defendant-Intervenors. | **NON-CONFIDENTIAL**<br>Proprietary Information<br>Removed from Pages 10, 14,<br>15, 17, and 31 to 36<br><br>Court No. 21-00129 |

**RESPONSE BRIEF OF DEFENDANT-INTERVENORS MINH PHU SEAFOOD JOINT**
**STOCK COMPANY and MSEAFOOD CORPORATION IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant-Intervenors Minh Phu Seafood Joint Stock Company and MSeafood

Corporation (collectively "Minh Phu") file this response brief in opposition to the August 30,

2020 Rule 56.2 Motion and supporting brief filed by Plaintiff Ad Hoc Shrimp Trade

Enforcement Committee ("AHSTEC"), ECF No. 33.

**I.      INTRODUCTION**

Minh Phu is the largest processor/exporter of frozen warmwater shrimp in Vietnam, and

sells shrimp to countries all over the world, including the United States.  Its sales to the United

States are all through its subsidiary, MSeafood Corporation ("MSeafood"), which is located in

the United States and acts as the importer of record.  MSeafood only imports shrimp from Minh

Phu and its affiliated companies.  Minh Phu's supply of shrimp comes primarily from two

1

sources:  (1) hundreds of unaffiliated Vietnamese shrimp farmers, who sell their raw shrimp to Minh Phu; and (2) Minh Phu's affiliated Vietnamese farms.  In recent years, Minh Phu has invested heavily in this part of its supply chain, and now operates its own farms and hatchery that supply a large and increasing proportion of the raw shrimp used in processing.

In 2004, the U.S. Department of Commerce ("Commerce") initiated an antidumping duty ("AD") investigation into Frozen Warmwater Shrimp ("Shrimp")[1] from Vietnam.  *Certain Frozen and Canned Warmwater Shrimp and Prawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, 69 Fed. Reg. 1,301 (Dep't Commerce Jan. 8, 2004).  Minh Phu participated as a respondent in the initial investigation and in each subsequent administrative review of the AD order following an affirmative finding of dumping and injury.  In Commerce proceedings, because Vietnam is considered a non-market-economy country, Minh Phu was required to provide information to value factors of production, including its inputs (*i.e.*, raw shrimp).  During the course of the Commerce proceedings, including the 2014-2015 AD review, Minh Phu reported that it purchased a relatively small quantity of frozen raw shrimp from India and imported this shrimp into Vietnam from India.  *See, e.g.*, C.R. Doc. 5 at Exhibit D-5.  Minh Phu was aware that even after processing, this shrimp was not considered Shrimp from Vietnam. P.R. Doc. 2 at Exhibit 4.

In 2016, Commerce revoked the AD order on Shrimp with respect to Minh Phu.  *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Notice of Implementation of*

---

[1] The terminology used in this brief for "Indian origin shrimp" may also include "imported shrimp" (Indian origin shrimp is a subcategory of Imported shrimp) and Indian shrimp.  This is a semi-processed product which is purchased and imported frozen from India.  Vietnamese origin shrimp is also referred to as "raw shrimp" (Vietnam origin shrimp is the only shrimp purchased raw, *i.e.*, not frozen), "Vietnamese shrimp" and "domestic shrimp."  Vietnam origin shrimp includes both shrimp purchased from unaffiliated shrimp farms and shrimp sourced from Minh Phu's affiliated shrimp farms.  When the term "exported shrimp" is used, the text clarifies when this shrimp is exported to the United States.

*Determination Under Section 129 of the Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty Order*, 81 Fed. Reg. 47,756 (Dep't Commerce July 22, 2016), and accompanying Section 129 Decision Memorandum ("Section 129 Decision Memorandum"). As part of the revocation, Commerce directed Minh Phu to maintain certifications for its U.S. imports of Shrimp certifying that it was importing only Vietnam-origin Shrimp specifically processed by Minh Phu. Section 129 Decision Memorandum at 6. To comply with the terms of the revocation, Minh Phu began the implementation of a comprehensive tracing system for all of the Shrimp it exports to the United States to ensure that it is all Vietnam-origin. *See, e.g.*, C.R. Doc. 7 at Attachment 2, page 3. After establishing this tracing system, Minh Phu began preparing product traceability documents in compliance with the U.S. National Oceanic and Atmospheric Administration's ("NOAA") Seafood Import Monitoring Program ("SIMP"), under which Minh Phu is required to have the ability to trace all of its sales to the United States from farm to export. *See, e.g.*, C.R. Doc. 330 at 30. The SIMP information must be provided for each shipment entering the United States. *See, e.g.*, C.R. Doc. 229 at 9. In 2019, officials in charge of the SIMP program conducted audits to verify the accuracy of the information provided in Minh Phu's SIMP reports and found no discrepancies. *Id.* Minh Phu's system of tracing established that Minh Phu only imported Vietnam-origin Shrimp into the United States. *Id.*

AHSTEC, an ad hoc committee composed of Minh Phu's U.S. competitors, filed an allegation under the Enforce and Protect Act ("EAPA") against Minh Phu, claiming that Minh Phu was transshipping Indian-origin raw shrimp processed in Vietnam to the U.S. to avoid the antidumping duties applicable to Indian Shrimp. P.R. Doc. 2. In support, AHSTEC pointed out to U.S. Customs and Border Protection ("Customs" or "CBP") that Minh Phu had previously used Indian shrimp to value factors of production in the AD proceeding before Commerce, and

3

that Minh Phu imports unprocessed shrimp from India into Vietnam. *Id.* AHSTEC did not provide any evidence that any of this Indian-origin shrimp is exported to the United States.

Nonetheless, the Trade Remedy and Law Enforcement Directorate ("TRLED") initiated an EAPA investigation into Minh Phu. Minh Phu demonstrated on the record of this investigation that the tracing systems it implemented after revocation of the AD order allow it to ensure that it does not export Indian shrimp to the U.S. illegally. There is no evidence of evasion here.

## II.     STATEMENT OF FACTS

The Statement of Facts presented by AHSTEC is largely procedural and ignores significant facts relevant to this case. The following is a more complete statement of facts.

On July 22, 2016, following a Section 129 proceeding implementing the findings of the World Trade Organization dispute settlement panel, Commerce revoked the AD order with respect to Minh Phu's exports of processed Shrimp from Vietnam. *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Notice of Implementation of Determination Under Section 129 of the Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty Order*, 81 Fed. Reg. 47,756. As part of the revocation, Commerce directed Minh Phu to maintain certifications for its U.S. imports of Shrimp declaring that those imports were Vietnam-origin Shrimp specifically processed by Minh Phu and excluded from the Vietnam AD order. *Id.* at 47,758. In order to comply with the terms of the revocation and to ensure that it would not import processed Shrimp covered by any antidumping or countervailing duty ("CVD") order, in 2016 Minh Phu began the implementation of a comprehensive tracing system for all of the Shrimp it exports to the United States. *See, e.g.*, C.R. Doc. 7 at Attachment 2, page 3.

Since January 1, 2019, Minh Phu also has been required to prepare product traceability documents using its tracing system in order to comply with SIMP. *Id.* Under SIMP, as explained in Section I, *supra*, an exporter to the United States must have the ability to trace all of its sales to the United States from farm to export, and must provide SIMP information for each shipment entering the United States. *Id.* Notably, SIMP does not require such tracing for sales to countries other than the United States. Officials in charge of the SIMP program have conducted audits to verify the accuracy of the information provided in Minh Phu's SIMP reports and have not found any discrepancies between the information provided and the origin of the shrimp resulting from Minh Phu's system of tracing. C.R. Doc. 229 at 9.

On June 5, 2019, Minh Phu learned that an EAPA allegation had been filed against Minh Phu and its affiliate MSeafood Corporation on May 12, 2019. C.R. Doc. 7 at Attachment 1. Minh Phu only learned of the existence of an allegation against it by means of a May 17, 2019 letter from U.S. Congressman Darin LaHood. This letter urged Customs to initiate an investigation into the allegation against Minh Phu, which claimed that Minh Phu was exporting Indian-origin Shrimp to the United States as Vietnam-origin Shrimp. *Id.* According to Congressman LaHood's letter, the reason to initiate the investigation was a combination of Minh Phu's purchases of frozen shrimp from India and its increased exports to the United States. *Id.* The party or parties making the EAPA allegation were not identified. Upon learning of the existence of this allegation, Minh Phu issued a press release to communicate to its shareholders that, while it has imported shrimp from India into Vietnam, it has not and does not export the resulting processed Shrimp to the United States, and that it would comply fully with Customs in any investigation of these allegations. P.R. Doc. 38 at Exhibit 5. In the press release, Minh Phu also informed its shareholders that it is continuing to expand its integrated farms and is working

with hundreds of other independent farmers and feeders in Vietnam to develop its supply chain. *Id.*

Customs requested, in July 2019, to meet with Minh Phu, and scheduled a meeting in Vietnam.  C.R. Doc. 7 at 1.  However, the meeting was postponed and never took place, and Customs never requested that Minh Phu submit a Customs Form 28, which has typically been used by Customs as a preliminary information-gathering step in EAPA investigations.  *Id.* Nonetheless, on September 13, 2019, Minh Phu voluntarily served Customs with a 1,500 page response to a sample EAPA request for information in order to provide Customs with basic information to address what Minh Phu thought was the basis of the accusations against it based on Congressman LaHood's letter.  *Id.*  Customs later claimed that it had neither received nor considered Minh Phu's hand-delivered September 13, 2019 submission.  *Id.*

Unbeknownst to Minh Phu, on July 17, 2019, a group of Minh Phu's competitors, operating under the name AHSTEC, filed the final version of their Allegation with Customs. P.R. Doc. 2.  Minh Phu can only assume that AHSTEC was the same party that filed the earlier allegation — but has never had confirmation of that fact.  In the Allegation, AHSTEC claimed that Minh Phu is evading the Order by importing India-origin Shrimp into the United States while claiming that those Shrimp were country of origin Vietnam.  *Id.*  More specifically, AHSTEC claimed that Minh Phu does not have access to enough Vietnam-origin shrimp to fully supply the U.S. market using Vietnam-origin Shrimp, so it was filling U.S. export orders with India-origin Shrimp to make-up the shortfall.  *Id.* at 43.  In support, AHSTEC pointed to Minh Phu's press release informing its shareholders of the initial May 2019 allegation, a comparison of the quantity of shrimp produced by Minh Phu's affiliated farms and its total export volume, Panjiva data showing Minh Phu's imports of shrimp from India into Vietnam, and documents

from the 2011-12 and 2014-15 Commerce AD reviews pertaining to Minh Phu. *Id.* at 39-44. AHSTEC argued that these together reasonably suggested that Minh Phu is evading the Indian Shrimp Orders. *Id.* On August 30, 2019, AHSTEC supplemented the Allegation at the request of TRLED with Excel versions of certain Allegation exhibits and screenshots of websites used as citations. P.R. Doc. 4.

On September 18, 2019, TRLED informed AHSTEC that it officially acknowledged receipt of the Allegation. P.R. Doc. 5. On September 30, 2019, AHSTEC further supplemented the Allegation with an example of SIMP reporting from an unrelated importer, as well as Panjiva data showing exports of shrimp from India to Minh Phu in Vietnam. C.R. Docs. 2-3. AHSTEC submitted a third supplement to the Allegation on October 8, 2019. P.R. Doc. 8.

On October 9, 2019, following AHSTEC's four submissions, TRLED initiated the EAPA Investigation. P.R. Doc. 10. As the basis for initiation, TRLED averred that the India-to-Vietnam shrimp purchases by Minh Phu, as well as the June 2019 press release, "reasonably suggest" that Minh Phu was evading the Orders by importing India-origin Shrimp into the United States. *Id.* Pursuant to the Investigation, on December 20, 2019, TRLED added a memorandum to the record containing Minh Phu's monthly export snapshots covering May 2019 through October 2019 prepared for its shareholders, parts of Minh Phu's Section D Response in the Commerce 2014-15 AD review in which Minh Phu discussed its purchases of Indian shrimp in the context of valuing factors of production, Panjiva data showing aggregated exports of shrimp from India to Vietnam, and a comparison of Indian exporters to Minh Phu from Panjiva to those listed in the Commerce response. C.R. Doc. 5.[2]

---

[2] TRLED appeared to mistakenly refer to the *total* value of *all* Indian shrimp exports to Vietnam over a specified period as the value of Indian shrimp exports *specifically to Minh Phu* over that period.

On January 14, 2020, TRLED preliminarily determined that the Allegation, AHSTEC's supplemental submissions, and the December 20, 2019 memorandum gave TRLED a "reasonable suspicion" that Minh Phu had evaded paying antidumping duties by exporting Indian-origin Shrimp to the United States while claiming that it was of Vietnamese origin. C.R. Doc. 6. More specifically, TRLED based its finding on (1) an alleged discrepancy in the June 2019 press release, (2) Panjiva data placed onto the record by TRLED, and (3) Minh Phu's Section D response from Commerce's 2014-15 AD review. *Id.* As a result of TRLED's preliminary finding, Customs imposed a cash deposit and a live-entry requirement on Minh Phu's imports of shrimp, meaning that before its imports are allowed into U.S. commerce, Minh Phu was required to pay cash deposits at the Indian AD investigation rate of 10.17% on *all* of its shrimp imports. *Id.* at 7-8. This cash deposit requirement was in addition to the continuous bond that Minh Phu already had in place. C.R. Doc. 220.

On January 17, 2020, TRLED sent the public version of the Interim Measures, as well as the Allegation and its supplements to Minh Phu. This was the first notice that Minh Phu received that TRLED had initiated an EAPA investigation and the first notice to Minh Phu of the existence of AHSTEC's July 2019 Allegation. It was also the first time Minh Phu learned that TRLED had been collecting documentation since July 2019 from parties adverse to Minh Phu but had not requested any information from Minh Phu itself.

On January 31, 2020, Minh Phu refiled the submission that it had hand-delivered to Customs on September 13, 2019, and it served the public version of the resubmission on AHSTEC. C.R. Doc. 9. The resubmission provided an explanation of Minh Phu's tracing system, including when, how, and why it was implemented, and gave a broad overview of Minh Phu's operations. *Id.* The vast majority of the narrative portion of the resubmission, which

explained each of the attached confidential exhibits, was submitted as public information. *Id.* at Attachment 2. In addition, each subpart of each confidential exhibit included a cover page that summarized the information in the exhibit. P.R. Doc. 13. Nonetheless, on February 28, 2020, AHSTEC filed a letter complaining that certain bracketed information should not have been treated as confidential. P.R. Doc. 16. AHSTEC's letter laid-out in detail its general understanding of the substance of the information, but requested that TRLED require Minh Phu to refile the submission anyway, within two business days. *Id at 2.* TRLED never requested such a resubmission from Minh Phu.

On February 25, 2020, TRLED issued its initial request for information questionnaires ("RFI") to Minh Phu and MSeafood. C.R. Docs. 8-9. Minh Phu and MSeafood submitted their RFI responses on March 19, 2020 and March 23, 2020, respectively. C.R. Docs. 229, 330. In Minh Phu's RFI response, it explained in detail its production process and tracing system. C.R. Doc. 330 at 29-33.

On March 25, 2020 and March 31, 2020, AHSTEC filed their comments on the MSeafood and Minh Phu RFI responses. P.R. Docs. 18-19. In each of them, rather than commenting on the substance of the information provided in the narrative, AHSTEC simply repeated that the public summaries were inadequate. *Id.* AHSTEC did not explain why the hundreds of separator pages, the public narrative descriptions, and the public exhibit list did not give it a reasonable understanding of the substance of Minh Phu's response. *Id.* Instead, they pointed out that information about Minh Phu employees, treated as confidential by Minh Phu, was on websites like LinkedIn, and that therefore the identities, and current roles and responsibilities of these employees should not be treated as confidential. *See, e.g.*, P.R. Doc 18 at 7.

On May 1, 2020, Minh Phu submitted a voluntary response in order to respond to the Interim Measures more fully and to explain its production processes in greater detail. C.R. Doc. 26. First, Minh Phu questioned why, regardless of content, its questionnaire responses from the 2014-15 AD Commerce review were relevant to its current tracing system which it had updated since that review to comply with the terms of the revocation and, later, SIMP reporting requirements. *Id.* at 3-5. Second, Minh Phu explained that the supply figure in the June 2019 press release related to Minh Phu affiliated farms only, and did not correspond to Minh Phu's total supply of Vietnam-origin shrimp. *Id.* at 6-8. Minh Phu also noted that all domestic shrimp is sourced from both Minh Phu affiliated farms *and* non-affiliated Vietnamese farms. *Id.* at 7-8. There was therefore no discrepancy between Minh Phu's supply and its export quantities. *Id.* Third, Minh Phu analyzed its own purchase, production, and export statistics using in part the media releases placed onto the administrative record in the December 20, 2019 memorandum. *Id.* at 8-13. Minh Phu demonstrated that it had more than enough Vietnam-origin shrimp supply to fill its orders to the United States, but that it used Indian-origin shrimp when necessary to fill its orders to other countries. *Id.* at 12, Exhibit 3.[3] Fourth, Minh Phu provided another explanation of its tracing system to supplement and clarify the one provided in its March 23, 2020 RFI response:

> For all orders shipped to the United States, MPG only uses raw shrimp sourced from Vietnamese farms, both farms owned by MPG and those owned by other Vietnamese suppliers. These shrimp are delivered directly from the farms to MPG's factories after harvest, and are sized and delivered to production the same day. As a result, the first time these raw shrimp are frozen is at the end of the production process when they are entered into finished goods inventory. Notably, MPG's farms (*i.e.*, Minh Phu Loc An and Minh Phu Kien Giang) deliver directly to MPCM or MPHG. For other domestically-sourced raw shrimp, MPG employs agents to travel to Vietnamese farms and fish markets to

---

[3] While the United States is Minh Phu's largest export market, exports to the United States represented only [          ] of Minh Phu's total exports worldwide from January 2018 to February 2020. *See id.* at Exhibit 3.

collect the raw shrimp for prompt delivery to MPG's factories.  This ensures that the shrimp remains fresh upon arrival at the factory.  However, these agents only collect shrimp from non-MPG Vietnamese farms.

When the Vietnamese-origin raw shrimp is delivered to MPG's facilities, MPG receives an invoice from the affiliated or unaffiliated supplier.  These value-added tax ("VAT") invoices show the supplier of the shrimp, the total quantity of shrimp ordered, along with the tax information of the supplier.  Upon delivery, MPG also requires its suppliers to fill out "Origin Declarations" that show the name of the farm from which the shrimp was supplied, and the specific harvest area on that farm (see samples in Exhibit 20 of MPG's March 23, 2020 submission).

Shortly after being delivered to MPG, the shrimp is taken to production for processing.  The first step of processing involves de-heading and de-veining.  Notably, all domestic raw shrimp is purchased in head-on-shell-on ("HOSO") form, whereas all imported shrimp comes headless and pre-frozen.  Thus, domestic shrimp must go through this initial process before being taken to sizing.  This process results in the weight of the shrimp (and sometimes the quantity due to discovered defects) decreasing before it is sized.

After the initial processing, the shrimp are placed into a basket marked with a trace code along with the name of the supplier.  This tag allows workers to easily identify the source of the shrimp.  This stage is also where processing for imported shrimp begins — imported shrimp is placed into separate bins for thawing.  These bins indicate the projected size of the shrimp along with an "XH" to denote that the shrimp is imported.  Each bin/basket proceeds to the next stage separately, minimizing the risk of accidental mixing of imported and domestic shrimp during sizing.

During sizing, the shrimp in each bin/basket is sized and graded, and is put into corresponding baskets.  These new baskets (which are subdivision of the previous bin/basket) are weighed and tagged with:  (i) the source of the shrimp (*i.e.*, imported or domestic); (ii) the traceability code; (iii) the short name of the finished product to identify the processing the shrimp will undergo; and (iv) the brand name required by the customer to be placed on the package.  The shrimp is then transported to a production line for further processing in accordance with the information on the tag.

At these production lines, the shrimp are further processed as they come in, *i.e.*, by basket.  If some baskets for the same order contain an "XH," then these shrimp are mixed during further processing with domestic shrimp for the same order.  This is the **first time** that imported shrimp comes into contact with domestic shrimp, and this intermingling **only occurs** for orders which have **already been designated as containing imported shrimp**, per the tags placed on the basket during pre-processing.  As a result, no accidental intermixing of shrimp occurs.  These production lines record the shrimp that they process on paper Production Record documents were provided in MPG's March 23, 2020 submission at Exhibit 20.  As those documents show, some orders involve mixed shrimp.  The quantity of imported shrimp (marked with an "XH") and the quantity of

11

domestic shrimp for each such order are separated on these records.  Notably, **none of these intermixed orders were for export to the United States**.  No U.S.-bound orders contain any shrimp marked with an "XH," and therefore **do not** contain imported shrimp.

After going through the further processing production lines, the shrimp are again weighed, frozen, packed into cartons, and then transferred to finished goods inventory to await the remainder of the shrimp for the order to go through production so that all shrimp for an order are shipped together.  Before being transferred to finished goods inventory, the Quality Management Department routinely takes some finished shrimp for testing, resulting in slightly reduced quantities in finished goods inventory than are shown as going through production.

Once all of the shrimp for the order has been accumulated in finished goods inventory, the Sales Department sends the "Goods Issue Order" to the Inventory Department, instructing them to draw the order from finished goods inventory.  The Inventory Department then creates a "Goods Issue Voucher" to note the order being drawn from finished goods inventory.  The order then is shipped to the port for export.

*Id.* at 15-17 (emphasis in original).  This entire explanation was provided in the public version of Minh Phu's submission.  P.R. Doc. 38 at 15-17.  Finally, Minh Phu provided SAP records showing the destination of imported shrimp used in production.  *Id.* at 17-18.  As in its earlier responses, these records were incredibly detailed and contained each entry in its system in order to provide as much information as possible.

On May 7, 2020, AHSTEC submitted rebuttal comments to Minh Phu's voluntary submission.  P.R. Doc. 64.  These comments were limited to a comparison of Minh Phu's description of its present production process with the descriptions submitted to Commerce in the antidumping review five years prior.  AHSTEC also briefly commented on its belief that Minh Phu's public summaries were not adequate.  *Id.*

On May 20, 2020, TRLED issued supplemental RFI questionnaires for MSeafood and Minh Phu, to which Minh Phu responded on June 3, 2020 and June 11, 2020, respectively.  C.R. Docs. 62, 213.  In Minh Phu's supplemental response, TRLED requested the following:

11. Provide a bill of lading report for all the covered merchandise imported from India. Include references to the importer name, dates, goods descriptions, commercial invoices, source vendor and country, bills of lading, and total kilograms/pounds received during

September 18, 2018 through January 31, 2020. Include a purchase value column with VND, U.S. currency, or conversion to U.S. currency. Provide enough information to tie forward to the SAP goods receipt history with origin, "Factory code", "Type" (for mark "XH"), "Trace code", and "Batch Note", and any other information to show Indian shrimp/prawns were not commingled with Vietnamese shrimp/prawns. Identify the plant name for the factory code and trace code.

C.R. Doc. 213 at 13. Minh Phu responded that it could not trace individual imported shrimp from import bill of lading through to finished goods inventory because imported shrimp gets mixed with other imported shrimp during sizing and are not withdrawn from the intermediate warehouse all at one time. *Id.* at 13-18. However, Minh Phu explained that it could and does segregate and trace all imported shrimp collectively. *Id.* Minh Phu proceeded to reiterate the detailed description of its tracing system as given in its May 1, 2020 submission.

Specifically, as it had explained in the May 1, 2020 response, once imported shrimp arrives at Minh Phu's facilities, it is placed in imported shrimp frozen storage, at which point Minh Phu demonstrated at this stage it still traces the shrimp back to bills of lading. *Id.* at 13-14. Later, when production anticipates needing imported shrimp to supplement the processed Shrimp for non-U.S. orders, it issues vouchers to move shrimp from frozen storage to an area of Minh Phu's factory, the "intermediate warehouse," that also only contains imported shrimp. *Id.* at 14-15. Minh Phu reconciled these transfers to the account valuation in the accounting system. *Id.* at 15, Exhibit 33. Minh Phu explained that once imported shrimp reaches the intermediate warehouse, it could stay there for up to weeks at a time, as imported shrimp is brought there based on estimated need, not precise figures. *Id.* at 15. The weight change of shrimp during sizing makes the estimation even less precise. *Id.* As a result, the estimates err on the side of caution, and more shrimp is placed into intermediate warehouse than may be needed. *Id.* More importantly, Minh Phu cannot trace *individual imports* to the original bills of lading after this

NON-CONFIDENTIAL

point, although Minh Phu maintains the identity of these shrimp *collectively* as imported. *Id.* at 16.

In sum, Minh Phu explained that while it cannot tie specific import bills of lading to specific exports of imported shrimp, it traces all imported shrimp into segregated inventory, and out from that inventory to individual sales to ensure that all imported shrimp is accurately labeled and tracked throughout the import-production-export process. *Id.* at 18.  In other words, Minh Phu's system is able to guarantee that imported shrimp is not exported to the United States. Of this explanation, which is virtually identical to the description of the same system in the May 1 response, only the account codes and the associated exhibits were marked confidential. P.R. Doc. 217 at 13-18.

While preparing the supplemental responses, Minh Phu also discovered that one of the export shipments made by its affiliate Minh Phat to [            ] contained mixed Vietnam-origin shrimp and shrimp marked "XH."  C.R. Doc. 213 at 8.  Minh Phu looked through its records and was able to trace back to the paper production records that are recorded during further processing, and determined that [      ] of "XH" shrimp was included in that shipment. *Id.* at 9.  Minh Phat's sales team informed Minh Phu that this error occurred due to a misunderstanding about [                                        ]. *Id.* at 8. Because the quantity was so small, Minh Phu had not noticed and identified this shipment in its earlier responses. *Id.* at 8-9.  However, those responses did show the single shipment containing "XH" shrimp going to [            ], demonstrating that Minh Phu's system was able to isolate "XH" shrimp and can be used to identify any similar ministerial errors (of which there were none). *Id.* at 9.

14

NON-CONFIDENTIAL

On September 14, 2020, pursuant to TRLED's schedule, Minh Phu submitted its written arguments. C.R. Doc. 214. Minh Phu reiterated the lack of a basis for initiation based on the Allegation and for the Interim Measures based on the Allegation and the misperceived media reports. *Id.* at 2-9. Minh Phu also provided another explanation of its tracing system, which had been found compliant with SIMP. *Id.* at 9-17. Critically, SIMP reporting requires that Minh Phu be able to trace exports to the United States from farm to export. *See id.* at 12. It does not require the same for sales to countries other than the United States. Minh Phu explained that its tracing system is thus more sophisticated for domestic shrimp, which are the only Shrimp exported to the United States. Minh Phu reiterated that it nonetheless has a tracing system in place to track imported shrimp in the aggregate that ensures that shrimp is not inadvertently commingled. *Id.* at 13-15. Finally, Minh Phu discussed the [          ] order, explaining that this sole occurrence of a shipment to the United States containing imported shrimp was actually identified as an anomaly using Minh Phu's tracing system, and that there were no subsequent occurrences of this ministerial error. *Id.* at 16-17. Because this error affected only a *de minimis* amount, *i.e.*, [     ] and only occurred once during the period investigated, a clerical error that could not by any stretch of the imagination fit the definition of evasion. *Id.* at 17.

On September 28, 2020, AHSTEC filed its response to Minh Phu's written arguments. P.R. Doc. 219. AHSTEC argued that Minh Phu should have made its business confidential information available to AHSTEC, and that only public information could rebut their allegation of evasion. *Id.* at 4-7. AHSTEC also argued that Minh Phu comingled Indian and Vietnamese shrimp and based its position on Minh Phu's submissions in the 2014-15 AD review of shrimp from Vietnam (before the revocation of the Antidumping Order with respect to Minh Phu and implementation of its tracing system). *Id.* at 8-9. AHSTEC further stated that Minh Phu's

claims that it has a tracing system that it put into place in late 2016 are inconsistent with statements about its inability to trace imported shrimp during the 2014-15 AD review. *Id.* at 9-12. Finally, AHSTEC stated that the business proprietary treatment of Minh Phu's confidential information prevented it from comparing the tracing system with the one described in the Commerce responses, but argued that substantial evidence nonetheless supported a finding of evasion. *Id.* at 12-13.

On October 13, 2020, TRLED determined that there was substantial evidence that Minh Phu entered Indian shrimp into the United States through evasion. C.R. Doc. 217. In making this decision, TRLED determined that Minh Phu did not cooperate to the best of its ability in the EAPA investigation because it was unable to trace its imported shrimps' bills of ladings to specific exported shrimp in the manner requested by TRLED. *Id.* at 7-8. Furthermore, TRLED held that the fact that Minh Phu was able to identify one instance in which it mistakenly sold "XH" shrimp to the United States, even though Minh Phu claimed that it could not trace all of its sales of imported shrimp through to their Vietnamese import bills of lading, was further proof of its failure to cooperate. *Id.* at 8. Therefore, TRLED found that the application of facts available with an adverse inference was justified. *Id.* at 9. Moreover, according to TRLED's determination, because the record evidence Minh Phu provided is unreliable, the record evidence does not contain sufficient evidence to show how much Indian shrimp was exported to the United States. *Id.* at 9-10. In applying its adverse inference, TRLED concluded that Minh Phu's "history of co-mingling Indian and Vietnamese shrimp" (based on the 2015 AD review), records of Minh Phu importing Indian shrimp into Vietnam, its refusal to provide the requested tracing information in the manner requested by TRLED, and the instance in which it identified a small quantity of mixed Vietnamese and "XH" shrimp shipped to the United States all indicate a strong

likelihood that Minh Phu co-mingled Indian and Vietnamese shrimp in its exports to the United States. *Id.*

On November 7, 2020, Minh Phu filed its request for administrative review with the Office of Regulations and Rulings ("ORR"). C.R. Doc. 218. In its request, Minh Phu focused on the application of adverse facts available ("AFA") which, in lieu of actual evidence of evasion, TRLED relied upon as the sole basis for its determination. *Id.* at 12-17. Minh Phu explained that it complied with the requests for information to the best of its ability, submitting voluminous responses, voluntary submissions, reconciliation of all data, and answered questions as well as it was able. *Id.* at 12-17. Minh Phu also pointed out that the sole shipment of imported shrimp to the United States was information that *it* brought to the attention of TRLED in its efforts to cooperate and had nothing to do with the adequacy of its tracing system. *Id.* at 17-19. Minh Phu discussed the effectiveness of its tracing system and, consistent with its description of its tracing system, the records it used to isolate and determine the precise amount of "XH" shrimp contained in the [                    ] shipment. *Id.* Minh Phu further explained why it was not able to trace the specific imported shrimp to the Vietnam-import bill of lading, as it had explained to TRLED. *Id.* at 19-21.

Minh Phu also argued that the Commerce AD responses from at least five years prior were irrelevant to the current period of investigation, particularly because Minh Phu implemented a tracing system subsequent to and as a condition of the revocation specifically to prevent exportation of non-Vietnamese shrimp to the United States. *Id.* at 22-23. That same argument had been made to TRLED. Moreover, evidence related to the period of investigation demonstrated a robust and effective tracing system that ensures that all imported foreign-origin shrimp and domestic Vietnam-origin shrimp that is commingled is considered to be imported

17

shrimp to prevent even small amounts of imported shrimp from being shipped to the United States. *Id.* at 23-24.  Minh Phu also questioned why the admitted fact that Minh Phu imported Indian shrimp into Vietnam was determinative of the question of transshipment, in light of the fact that Minh Phu reconciled its purchases of Indian shrimp with its sales of imported shrimp. *Id.* at 24-25.  Furthermore, Minh Phu argued that the fact that it was unable to do what was requested by TRLED, *i.e.*, trace individual imported shrimp from import bill of lading to export, did not make it uncooperative, especially when Minh Phu had explained and showed how it did and could trace imported shrimp. *Id.* at 25-27.  Instead, the fact that Minh Phu went to great lengths to explain why it could not trace in the manner requested by TRLED demonstrating full cooperation to the best of Minh Phu's ability. *Id.*  Finally, Minh Phu reiterated that the one instance of a *de minimis* quantity of shrimp being shipped to the United States did not constitute evasion, as it was a clerical error that was not repeated, which could not demonstrate a pattern of negligent conduct. *Id.* at 28-30.

On November 25, 2020, AHSTEC responded to Minh Phu's request for administrative review. P.R. Doc. 230.  In its response, AHSTEC argued that (1) the Commerce responses were relevant because Minh Phu had asked Customs about country of origin of commingled shrimp in 2007, but was still commingling as recently as 2015, (2) that Minh Phu's tracing system does not provide adequate safeguards to prevent comingling, (3) that it was appropriate to apply AFA to Minh Phu because its ability to trace imported shrimp is required under SIMP, even though SIMP only covers shrimp exported to the United States, and (4) that TRLED could apply AFA because Minh Phu not providing enough evidence to show that it was not evading was sufficient grounds to presume that it was evading. *Id.*

On February 11, 2021, ORR reversed TRLED's determination, finding that Minh Phu did not fail to cooperate to the best of its ability, so the application of AFA was inappropriate. C.R. Doc. 219. ORR examined, in particular, Minh Phu's description of its tracing of imported shrimp, which was the specific information upon which the application of AFA relied. *Id.* at 8-10. Upon review, ORR agreed with Minh Phu that it "cannot be the case that if a company's system makes it impossible for it to report data in a specific way requested by Customs, that it is then *per se* not cooperating to the best of its ability if it can achieve the same result by a different method." *Id.* at 9 (quoting C.R. Doc. 218 at 12). ORR therefore concluded that Minh Phu was not unresponsive, but rather responded to the best of its ability given the practical difficulties with TRLED's requests. *Id.* ORR also agreed that the fact that Minh Phu was able to identify the single anomalous shipment of Indian shrimp to the United States, explain how it was identified, and demonstrate that no other such shipments existed proved the effectiveness of its system in being able to track the origin of shrimp shipped to the United States. *Id.* at 9-10. ORR therefore concluded that Minh Phu's internal tracking system of imported shrimp as well as its accounting reconciliations had not been proven unreliable. *Id.* at 10. Given that there was no evidence of evasion, and because TRLED's determination was based on pure adverse facts available, ORR found that Minh Phu did not evade the Order. *Id.* at 10. This appeal followed.

## III.    SUMMARY OF ARGUMENT

The only issue that could result in a reversal of the results of the ORR review is whether it was appropriate for TRLED to apply adverse facts available in making its determination in the investigation. It is, therefore, surprising that AHSTEC does not even attempt to argue that TRLED's decision to apply AFA to Minh Phu was supported by the record in this case and that ORR's decision should therefore be overturned. Instead, AHSTEC focuses the entirety of its

brief on secondary issues that, in addition to being incorrect, are not substantive such that they would change the results of ORR's determination to reverse the finding of evasion.

Indeed, there is no credible argument to be made that the application of AFA was appropriate in these circumstances. Minh Phu cooperated to the "best of its ability" and provided information using a different methodology than that requested by TRLED to demonstrate that Minh Phu's tracing system for imported shrimp is effective. As such, the application of AFA in the investigation was unwarranted based on the facts and the law. The arguments related to each of AHSTEC's allegations are addressed below.

There is no evidence that ORR failed to review the record or that it mischaracterized the evidence on the record. In its brief, AHSTEC merely supposes that ORR did not review the entire record. This allegation is borderline irresponsible. As AHSTEC has acknowledged, government officials are entitled to a presumption of regularity that they properly discharged their duties, absent clear evidence to the contrary. Rather than providing clear evidence, AHSTEC simply points out that some documents compiled for submission to this Court were inadvertently omitted from the initially filed record. This is neither the first nor the last time that this has occurred in cases before this Court. In addition, while AHSTEC takes offense at the fact that ORR focused on and cited primarily to a specific subset of documents on the record, this is also not clear evidence that ORR failed to discharge its duties. Instead, it simply indicates that ORR focused on the documents it found most relevant to its Determination, as it is reasonably allowed to do. There is simply no evidence to support AHSTEC's claims of dereliction of duty.

Furthermore, AHSTEC falsely claims that ORR mischaracterized the record. Upon a cursory review, it is evident that the *single* statement that AHSTEC pointed to as support of its claim was taken entirely out of context, and supports the opposite conclusion — that ORR gave

20

due consideration to the record.  AHSTEC's further allegations concerning the "evidence" that ORR "ignored" when reviewing the record are unfounded and fail to undermine the presumption of regularity.

Instead, it is clear from ORR's determination that it reviewed the record and conducted a *de novo* review of TRLED's Determination, as it is required to do.  More specifically, ORR addressed TRLED's use of adverse facts available, which was TRLED's sole basis for its finding of evasion.  As ORR correctly determined, Minh Phu complied with all requests for information to the best of its ability, and an adverse inference was, therefore, unwarranted.  ORR analyzed TRLED's Determination, but found that Minh Phu did the maximum it was able to do to provide an answer to TRLED's requests for information.  This effort, while not providing the information in the form specifically requested, demonstrated cooperation to the best of Minh Phu's ability.

ORR reasonably concluded that, absent the adverse inference applied by TRLED, there was no substantial evidence of evasion on the record.  Instead, the record indicates that Minh Phu has a comprehensive and robust tracing system for both imported and domestic shrimp that permits it to trace imported and Vietnam-origin shrimp through production to sale.

Contrary to AHSTEC's complaints that Customs' should have compelled Minh Phu to provide additional information in the public versions of its responses, Minh Phu's responses complied fully with the requirements set forth in Customs' regulations.  In EAPA cases, public versions of submissions must contain public summaries that permit a "reasonable understanding of the substance of the information."  19 C.F.R. § 165.4(a)(2).  This does not require disclosure of any information, numbers, calculations, processes, or other data that could provide another party with access to a company's records.

Minh Phu provided thousands of pages of summaries, public narrative responses, and explanations that permitted a reasonable understanding of the substance of the bracketed proprietary information it was submitting. Indeed, throughout the proceeding, AHSTEC demonstrated in its comments that it understood the substance of the information. Moreover, pursuant to the statutory scheme governing EAPA investigations, AHSTEC is simply not entitled to view more comprehensive confidential information.

AHSTEC appears to misunderstand EAPA proceedings. In EAPA proceedings, TRLED makes the initial determination as to evasion, not the alleging party. In EAPA administrative reviews, ORR, not the alleging party, conducts a *de novo* review of that determination. Customs, not the alleging party, is the finder of fact and examines all submitted materials, confidential and public, in making its determination. As an alleger, AHSTEC is not entitled to see all of the information on the record. The fact that it would have preferred access to Minh Phu's confidential records is irrelevant.

## IV.    STANDARD OF REVIEW

The Court is to examine Custom's determinations in two respects: (A) whether Customs complied with all procedures set forth in the statutory provisions covering EAPA investigations and reviews, and (B) whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 19 U.S.C. § 1517(g)(2).

In conducting its investigation, TRLED is to determine whether substantial evidence supports a finding that an accused importer evaded an antidumping or countervailing duty order. 19 U.S.C. § 1517(c)(1)(A). In conducting its administrative review of TRLED's investigation, ORR, is to review *de novo* the determination of TRLED after an examination of the record as a whole. 19 U.S.C. § 1517(f)(1); 19 C.F.R. § 165.45.

22

## V.    ARGUMENT

### A. ORR's Determination to Reverse TRLED's Determination of Evasion Was Not Arbitrary, Capricious or An Abuse of Discretion

#### 1.  There is no evidence that ORR failed to review the entire record in this case

AHSTEC alleges that ORR "conducted its review without addressing the record" and that there is "no indication" that ORR confirmed that the entire record was available to it during its *de novo* review.  ECF No. 33 at 36.  AHSTEC's arguments are based on mere supposition and not supported by any evidence in the record.

As AHSTEC itself acknowledges, a government official is entitled to a presumption of regularity such that *in the absence of clear evidence to the contrary*, public officers are presumed to have properly discharged their official duties.  ECF No. 33 at 36 (citing, *inter alia*, *Jazz Photo Corp. v. United States*, 439 F.3d 1344,1351 (Fed. Cir. 2006).  AHSTEC presents no "clear evidence" to overcome the presumption of regularity on the part of ORR.  In each of the cases cited by AHSTEC, the issue was whether notice was given by Customs of a particular action. And in each case, the party that successfully overcame the presumption of regularity presented *actual evidence* in the form of an affidavit that notice had not in fact been given.  Indeed, where no such evidence was presented, the Court has found that the presumption of regularity was *not* overcome.  *See International Cargo & Surety Ins. Co. v. United States*, 15 C.I.T. 541, 544-45 (1991).

In this case, there is simply no evidence, other than AHSTEC's say-so, that ORR failed to review the entire record.  To the contrary, ORR states explicitly that it reviewed the "entire administrative record upon which the initial October 13 determination was made by TRLED" as well as Minh Phu's request for review and AHSTEC's response.  C.R. Doc. 219 at 7-8.  This is consistent with the requirements under 19 C.F.R. § 165.45.  AHSTEC alleges that "the docket of

this litigation makes clear that CBP has been unable to compile a complete administrative record for the Court for the purposes of this appeal" and that this undermines ORR's claim to have reviewed the entire record.  ECF No. 33 at 37.  However, this allegation is completely unfounded.  It is correct that AHSTEC identified certain documents that were initially inadvertently omitted from the administrative record filed with the Court on May 17, 2021.  On June 15, 2021 Defendant United States acknowledged this inadvertent omission and requested additional time to correct the filed administrative record indices and confirm that all documents were now properly added.  The revised administrative record indices were filed on June 30, 2021.  In the two months between the filing of the revised administrative record indices and the filing of its brief, AHSTEC could have notified the court if it truly believed that "CBP has been unable to compile a complete administrative record for the Court," but it did not do so.

AHSTEC next takes offense at the number of documents cited in ORR's determination, stating that other than the arguments presented by Minh Phu and AHSTEC, the only other record document cited is Minh Phu's June 11 Supplemental RFI Response.  *Id.* at 38.  However, while AHSTEC might have preferred that ORR cite to additional sources, ORR identified the information that it found relevant to its determination.  That AHSTEC would prefer that it find other information to be more determinative is of no moment.  The entirety of TRLED's Initial Determination was based on Minh Phu's alleged failure to cooperate to the best of its ability, specifically, Minh Phu's alleged refusal in its June 11 Supplemental RFI Response, to trace individual imported shrimp from import bills of lading to entry into finished goods inventory. ORR is tasked with reviewing TRLED's determination with respect to the record as a whole. However, given that TRLED's determination was so focused on the alleged failure to cooperate, ORR's review of the determination also focused on the June 11 response and supporting

24

documentation.  Nowhere in its accusation of dereliction of duty does AHSTEC attempt to explain *why* ORR focused on that particular response, which was the response that underlies TRLED's AFA finding.  In light of the determination subject to its review, it would have been inappropriate not to examine TRLED's specific analysis.  However, there is simply no evidence on the record to suggest that ORR did not have access to or did not review the entire administrative record.

### 2.  ORR Properly Characterized the Evidence on the Record

AHSTEC alleges that ORR's determination is "arbitrary, capricious, and an abuse of discretion because the agency makes characterizations of the evidence on the record that are demonstrably false." *Id.* at 38.  However, the *only* allegedly false statement that AHSTEC cites is ORR's statement that there is "'insufficient documentary evidence on the record regarding this single shipment containing a *de minimis* amount of Indian-origin shrimp exported to' the United States." *Id.* (citing C.R. Doc. 219 at 9).  However, AHSTEC takes ORR's statement completely out of context.  ORR's point, and the full quotation is that "{d}ue to insufficient documentary evidence on the record regarding this single shipment containing a *de minimis* amount of Indian-origin shrimp exported to the United States, *CBP cannot speak to whether this shipment qualifies as a clerical error under the EAPA*." C.R. Doc. 219 at 9 (emphasis added).  ORR was not saying there was a lack of information regarding this sale generally but rather that the information was insufficient to assess whether the mistake acknowledged by Minh Phu would qualify as a clerical error under EAPA.  There is no evidence that ORR did not review the information on the record regarding this shipment.  In fact it did so, finding that "MPG's ability to identify the sale of a *de minimis* amount of imported shrimp from India commingled with Vietnamese-origin shrimp to the United States serves as reliable evidence that MPG's internal system is effective, though not without flaws." *Id.* at 10.

AHSTEC alleges that if ORR had reviewed the information regarding this sale it would see that this information "contradicted and substantially undermined Minh Phu's previous claims regarding the efficacy of its internal policies and control systems." ECF No. 33 at 38. AHSTEC is again mistaken. The information cited by AHSTEC, regarding brand names and market identifiers does not undermine anything asserted by Minh Phu regarding its internal policies. *Id.* at 38-39. Minh Phu has consistently reported that it tracks imported shrimp via the "XH" designation, and that it was this tracking system that allowed it to discover the one instance of imported shrimp mistakenly being sent to the United States. AHSTEC has failed to point to any record evidence that contradicts these assertions or demonstrates that there was in fact more than just this one shipment to the U.S. ORR recognized this fact when it found that this sale "serves as reliable evidence that MPG's internal system is effective, though not without flaws." *Id.* at 10. AHSTEC has pointed to nothing on the record indicating that ORR did not examine this sale in its review of the TRLED decision. AHSTEC's attempts to question the details of this sale are of no moment.

### 3. ORR correctly determined that the application of adverse inferences to Minh Phu was improper and that there was no record evidence of evasion

AHSTEC completely fails to address TRLED's actual findings in its Determination. TRLED did not find substantial evidence that Minh Phu evaded the orders on Indian shrimp. Instead, TRLED determined that Minh Phu should have been able to trace its imported shrimp in the specific manner requested by TRLED. When Minh Phu explained that it could not trace each imported shrimp in this manner, TRLED applied an adverse inference that Minh Phu commingled Indian-origin shrimp with Vietnam-origin shrimp in all of its Shrimp exported to the United States without regard to Minh Phu's explanation of how it actually was able to trace imported shrimp. ORR, however, determined that the application of an adverse inference to

Minh Phu was unwarranted, because it had responded to the best of its ability to TRLED's

requests and was able to demonstrate, albeit via a different method, that it tracks its imported

shrimp throughout the sales and production process.  C.R. Doc. 219 at 9.  As ORR correctly

determined, without an adverse inference there is simply no substantial evidence of evasion on

the record.  C.R. Doc. 219 at 10.

### i.  ORR Correctly Determined That It Was Inappropriate To Apply Adverse Inferences

AHSTEC glosses over the fact that TRLED's determination of evasion was based

entirely upon adverse inferences.  Their one reference to adverse inferences merely states:

> When Minh Phu declined to provide the information sought by the agency
> TRLED reviewed the record as a whole, provided a fulsome explanation for the
> agency's conclusion that the company's claims were unreliable, and applied an
> adverse inference to determine that MSeafood had evaded the antidumping duty
> order on Indian shrimp.

ECF No. 33 at 36.  Even this is a mischaracterization.  Minh Phu did not "decline" to provide

information requested by TRLED.  To the contrary, when TRLED requested that Minh Phu trace

all purchases of imported shrimp from purchase through production, Minh Phu explained that it

cannot trace an imported shrimp's bill of lading to a specific Shrimp in finished goods inventory.

However, it explained that it does segregate and trace all imported shrimp in order to ensure that

no imported shrimp is exported to the United States.  It then proceeded to demonstrate how its

system works.  *See* C.R. Doc. 213 at 13; *see also supra* at 13.

It cannot be the case that if a company's system makes it impossible for it to report data

in a specific way requested by TRLED, that it is then *per se* not cooperating to the best of its

ability if it can achieve the same result by a different method.  Put simply, a company can

cooperate to the best of its ability by presenting information in another form — particularly when

it has explained and demonstrated on the record how it can reach the same result with a

methodology that is feasible and reasonable.  The statutory provisions governing the application

of adverse facts available in the antidumping and countervailing duty context by the U.S.

Department of Commerce, 19 U.S.C. § 1677e, are substantially similar to those under the EAPA

statute, 19 U.S.C. § 1517(c) and judicial interpretations of the Commerce statute can be

instructive as to the requirements under EAPA.

First, neither the URAA Statement of Administrative Action, H.R.  Rep. Doc. No. 103-

316(1) at 870, (Dec. 18,1994) as reprinted in 1994 U.S.C.C.A. 4040, 4199, nor judicial

interpretation of 19 U.S.C. § 1677e, the provision setting forth the application of adverse

inferences in Commerce proceedings, have characterized the use of AFA to be punitive.  *See,*

*e.g, F. Ili De Cecco De Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032

(Fed. Cir. 2000).  To the contrary, both characterize the use of adverse inferences as necessary to

provide a disincentive or deterrent against non-compliance with requests for information by the

relevant authorities from the respondent.  Non-compliance is equivalent to "failure to cooperate,"

the term favored in the statute.  The issue before Customs in both the investigation and review

was not a failure by Minh Phu to cooperate, but rather its inability to cooperate with the specific

methodology requested by Customs.  In fact, Minh Phu did cooperate by providing such

information as was available to it, which addressed the same issue as Customs' methodology was

intended to address, namely whether Minh Phu could trace and segregate imported shrimp from

Vietnamese shrimp in order to ensure that only Vietnamese shrimp was used in product

ultimately exported to the United States.  It is difficult to see how the application of adverse

inferences in the circumstances of this case would be warranted where Minh Phu was unable —

not unwilling — to cooperate with the request for information as framed by Customs, but was

still able to respond to the underlying issue raised by Customs' request.  Indeed, neither TRLED

nor AHSTEC provided any information, much less substantial evidence, that Minh Phu did have or should have had the ability to comply Customs' preferred methodology given the structure of its production process.

Second, the Court of Appeals for the Federal Circuit ("Federal Circuit") has found it would be unreasonable for Commerce to request information from respondent that it did not have at its disposal. *Olympic Adhesives Inc. v. United States*, 899 F.2d 1565, 1572 (Fed. Cir. 1990). Specifically the Federal Circuit stated: "'No' answer is not a refusal to provide data. If there is no data, 'no' is a complete answer." *Id.* This pre- Uruguay Round Agreements Act decision has been followed in post- Uruguay Round Agreements Act decisions. *See, e.g.*, *Maverick Tube Corp. v. United States*, 37 I.T.R.D. 2829, 2016 WL 703575 (Ct. Int'l Trade 2016). As such, Minh Phu's failure to provide data based on the methodology insisted upon by TRLED was not a refusal to provide data, but an admission that it did not have the data based on the methodology insisted upon by TRLED. While this failure might have given rise to the use of "facts available" without an adverse inference, it cannot serve as the basis for application of adverse inferences. The case against applying adverse inferences becomes even more compelling when respondent has provided substantial alternative evidence addressing the same issue that TRLED sought to address in its methodology. Neither TRLED nor AHSTEC provided evidence, much less substantial evidence, to support a conclusion that respondent could have submitted information consistent with the TRLED request. Similarly, neither TRLED nor AHSTEC provided any evidence that the alternative substantial evidence did not serve the same purpose as the information requested by TRLED. Indeed, it is questionable whether TRLED actually analyzed Minh Phu's evidence with a view to answering their question. In contrast, ORR did so and concluded that Minh Phu did respond to the question posed.

Finally, in the most comprehensive decision addressing when it is permissible to apply

adverse facts available, *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003), the

Federal Circuit stated:

> '{T}he focus of {1677e(b)} is respondent's *failure to cooperate to the best of its
> ability,* not its failure to provide requested information.' *Nippon* Fed. Cir., 337
> F.3d at 1381 (emphasis in original). The court further stated that "the statutory
> mandate that a respondent act to 'the best of its ability' requires the respondent to
> do the maximum it is able to do." *Id.* At 1382.

*See also Shandong Huarong Gen. Group Corp. v. United States*, 27 C.I.T. 1568 (Ct. Int'l Trade

2003).  Here, despite the fact that it cannot trace imported shrimp in the exact manner requested

by TRLED, Minh Phu did the maximum it was able to do, and provided information comparable

to that request by TRLED to make its determination.  That is, Minh Phu demonstrated that it

segregates and tracks imported shrimp from importation to the intermediate warehouse that is

exclusive to imported shrimp, and that it traces all withdrawals of imported shrimp from the

intermediate warehouse throughout the production and sales process through use of the "XH"

marking.  As a result, Minh Phu can be sure that no imported Indian shrimp is sent to the United

States.  TRLED had no basis for ignoring this evidence.

ORR agreed with Minh Phu, finding that Minh Phu cooperated to the best of its ability

with TRLED's request for information.  ORR clarified that the fact that Minh Phu was able to

reach the same result as the methodology requested by TRLED by using a different method

actually demonstrated that it cooperated to the best of its ability, despite the practical difficulties

involved with doing so.  C.R. Doc. 219 at 9.

As Minh Phu explained, it reconciled its purchases of imported shrimp to its withdrawals

of imported shrimp from inventory into production and reconciled its withdrawals from finished

goods inventory of imported shrimp to export sales containing imported shrimp.  Minh Phu's

imported shrimp reconciliations begin with the [        ] "historical movement" imported shrimp inventory reports generated by Minh Phu's SAP system.  These reports show, among other things, the quantity and value (in VND) of imported shrimp purchases.  Minh Phu also can trace purchases in these reports to individual import bills of lading.  The total purchase price of inventory in these reports is added to the other costs associated with purchasing the imported shrimp (*i.e.*, shipping costs) that are recorded in SAP account [        ].  This total represents the cost of purchasing imported shrimp in a given period.  Minh Phu also values its imported shrimp inventory on a monthly basis (in the [        ] "valuated stock" reports).  Minh Phu showed at Exhibits 26 and 28 of its Supplemental RFI Response that these amounts are equivalent, which proves that Minh Phu is able to accurately record the amount coming into finished goods inventory in both its accounting and inventory systems.  C.R. Doc. 213.

This sum is then shown to be equal to the SAP inventory valuation of imported shrimp received in the given period (as provided in the [        ] "valuated stock" tabs).  This demonstrates that the quantity and cost of the imported shrimp purchased in the given period is the same as the quantity and value of imported shrimp entering inventory in the same period.

Notably, SAP account [        ] also tracks withdrawals from imported shrimp inventory into the imported shrimp "intermediate warehouse," where it awaits being drawn into production.  These transfers also correspond to paper transfer vouchers, an example of which Minh Phu provided at Exhibit 33 of its Supplemental RFI Response.  *Id.*  The [        ] account also shows the quantities of frozen shrimp being transferred to the intermediate warehouse.  Minh Phu shows that these quantities reconcile at Exhibit 34 of that response.  When it is determined that imported shrimp is needed to complete production orders, the  required quantity of imported shrimp is withdrawn from the intermediate warehouse into production.  This transfer is recorded

in the [        ] account and is tracked on a daily basis in the [        ] inventory movement account

(these amounts are shown to be equal at Exhibit 34 of that response).  Minh Phu provided an

example of its paper documents recording these withdrawals at Exhibit 35 of its Supplemental

RFI response.  *Id.*

These imported shrimp reconciliations demonstrate that Minh Phu is able to track the

shrimp it imports from the individual bills of lading through to when it is withdrawn into

production in both its accounting *and* inventory systems.  Minh Phu explained this reconciliation

clearly in its Supplemental RFI Response.  *Id.* at 13-18.  Nonetheless, TRLED ignored these

reconciliations, collectively dismissing them as "an accounting reconciliation that is unsupported

by Minh Phu's internal production records of the shrimp being processed at different stages."

C.R. Doc. 217 at 7.  This is plainly false.  These reconciliations were made between its inventory

and accounting systems and were supported by paper records to which they directly tied.

TRLED's claim to the contrary is unavailing and unsupported by substantial evidence.

In its Supplemental RFI Response, Minh Phu also explained that it cannot trace an

imported shrimp's bill of lading to a specific export sale of Shrimp because the imported shrimp

associated with various bills of lading is commingled with other imported shrimp after it is

withdrawn from the intermediate warehouse and thawed and sent for sizing.  However, just

because imported shrimp then loses its traceability to import bills of lading on an individual

basis, it never loses its identity as imported shrimp.  Because the tracing system that Minh Phu

does have in place ensures that imported shrimp always retains its identity as imported shrimp,

Minh Phu can tell the origin of the Shrimp exported to the United States.  Moreover, Minh Phu

established that all imported shrimp is immediately transferred upon arrival to a segregated

warehouse for frozen imported shrimp.  Additionally, all imported shrimp withdrawn from

imported shrimp inventory is marked in all of Minh Phu's records as "XH" and is tracked in the system.

Instead of actually examining Minh Phu's tracing system and its implementation, TRLED imposed its own idea of what a tracing system should look like. However, in rejecting Minh Phu's tracing system, TRLED provided no rationale for its insistence that Minh Phu's tracing system must be able to trace Indian and other shrimp imports from the original bill of lading to the export sale bill of lading, rather than being able to trace Indian and other imported shrimp from a segregated pool of imported shrimp throughout the entire production and sale process via the use of the designation "XH." That Minh Phu's tracing system does not conform to TRLED's preconceived notions is not justification for rejecting the evidence based on an alleged failure to cooperate. As ORR recognized, "MPG was not unresponsive to CBP's requests for information but rather, responded to the best of its ability given the practical difficulties of directly tracing imported shrimp throughout the production process from specific import bills of lading to specific export sales." C.R. Doc. at 9.

TRLED's determination mistakenly reasoned that Minh Phu's ability to identify the sale of [          ] of imported Indian shrimp inadvertently shipped to [               ] is proof that Minh Phu could have traced the rest of its sales of imported shrimp back to the Vietnamese import bills of lading as requested. Again, this is simply incorrect, as ORR recognized. *Id.* at 10. Minh Phu did not discover this mistake by somehow linking the Vietnamese-import bill of lading with the export bill of lading. Instead, it identified this mistake using its own tracing system described above. As Minh Phu established in multiple responses, it segregates all imported shrimp upon arrival and entry into inventory and marks it "XH" upon withdrawal from inventory. It retains this "XH" designation through processing, into finished goods inventory and sale. This allowed

33

NON-CONFIDENTIAL

Minh Phu to trace this specific shrimp — not back to the Vietnam-import bill of lading — but back to production documents that showed the "XH" quantity from withdrawal from the intermediate warehouse forward.

It did not trace the imported shrimp in that order backward from the point of XH designation because doing so is simply not possible. As a result, Minh Phu was not able to tie the [      ] of imported shrimp back to a particular import bill of lading, as TRLED suggested — but it was able to trace it back to intermediate inventory composed exclusively of imported shrimp and the production documents that gave the precise amount of imported shrimp that was in that shipment. Instead of acknowledging this difference, TRLED conflated the two, and claimed that this demonstrates that Minh Phu could have traced back its sales of imported shrimp to its Vietnam import bills of lading. It is unclear what gave rise to this misunderstanding, given the extensive explanation of Minh Phu's production processes that it provided TRLED across multiple submissions. It is also unclear how this constitutes evidence that Minh Phu cannot segregate and trace rather than evidence that it can and does segregate and trace. The fact that one *de minimis* shipment went to [          ] is evidence of a clerical mistake, not evidence of any inadequacy in Minh Phu's tracing system. Moreover, it demonstrates that Minh Phu can and does segregate and trace imported shrimp, as Minh Phu fully disclosed.

Furthermore, TRLED's faulty reasoning directly contradicts the following statement from page nine of TRLED's Initial Determination: "Minh Phu's failure to submit sufficient tracing information and cooperate to the best of its abilities means that Minh Phu was unable to demonstrate that it did not co-mingle Indian-origin shrimp with Vietnamese-origin shrimp on its sales to the United States during the POI." C.R. Doc. 217. In fact, Minh Phu's ability to identify the shipment to [          ] as containing Indian shrimp indicates that it can and does trace

NON-CONFIDENTIAL

imported shrimp to specific export shipments beginning with segregation of imported shrimp in in its warehouses to the point that it designates a batch as "XH" when imported shrimp is withdrawn from warehouse for processing, to tracing the imported shrimp based on the "XH" destination through the production and sales process.  As ORR recognized, Minh Phu's behavior in this investigation demonstrates neither a failure to cooperate nor an inability to trace its sales of Shrimp containing imported shrimp, including Indian shrimp. TRLED also apparently concluded that this example demonstrates that imported shrimp is co-mingled with Vietnamese shrimp.  This too is incorrect.  While imported shrimp was mistakenly included in a shipment of Vietnamese shrimp to the United States, it is incorrect that it was comingled such that it lost its identity as imported shrimp.  To the contrary, the [     ] kg of imported shrimp that were contained in a total shipment of [        ] kg of shrimp never lost their identity.  The mistake was not in the lack of a system for segregating or tracing imports, rather the mistake was the production team's erroneous belief that [

        ].  The system worked, and because it worked, Minh Phu was able to identify and disclose that this single shipment contained imported shrimp to TRLED.

As ORR found, non-cooperation cannot be based on a failure to respond to a request for information where the information does not exist and cannot, as a practical matter, be developed. Nor can non-cooperation be based on ignoring all of the other record information (*e.g.*, Minh Phu's tracing system, reconciliations, statistics, etc.) that directly and fully addresses the question at issue in this investigation, namely Minh Phu's ability to adequately trace the origin of shrimp that is exported to the United States.  The fact that bill of lading to bill of lading tracing is neither practicable nor possible does not justify a finding of non-cooperation, particularly since Minh

Phu has a functioning tracing system which ensures that imported shrimp is not shipped to the United States.

Far from demonstrating a faulty system, or a failure to cooperate with CBP, the discovery of a shipment of "XH" shrimp to [                    ] proves that Minh Phu's tracing system allows it to identify all sales containing imported Indian shrimp, even if the Indian shrimp is combined with domestically-sourced shrimp in a given sale, which was exactly the purpose of TRLED's request for traces of imported Indian shrimp. Minh Phu cooperated to the best of its ability with all requests for information from TRLED. Adverse inferences were, therefore, unwarranted based on the record of this investigation.

### ii.  ORR correctly determined there is no evidence on the record of evasion

In the review, ORR recognized that, as discussed in detail above, TRLED based its determination entirely on its application of adverse facts available, and that absent such an inference, the record did not contain *any* evidence that Minh Phu's tracing system was unreliable. Instead, the record indicated that, by designating each imported shrimp and each basket containing imported shrimp as "XH" from the time it is withdrawn from the intermediate warehouse for imported shrimp until it is withdrawn from finished goods inventory, Minh Phu's tracing system allows it to ensure that imported shrimp is segregated and traced separately from domestic shrimp to ensure that all shrimp exported to the United States is Vietnamese. C.R. 219 at 9. ORR further recognized Minh Phu's reconciliation of its withdrawals of imported shrimp from inventory and its withdrawals of imported shrimp from finished goods inventory to export sales as evidence of Minh Phu's ability to trace imported shrimp through production. *Id.* This evidence had been wrongly dismissed by TRLED.

As discussed extensively above, AHSTEC glazes over the fact that TRLED's Determination was based entirely on an adverse inference, and fails to point to any actual

evidence of evasion on the record.  ORR was therefore correct that, following its finding that

Minh Phu cooperated to the best of its ability, there was no substantial evidence of evasion.

**B. Minh Phu's Public Summaries Were In Compliance With Regulatory Requirements**

Unlike in Commerce proceedings, in which counsel for interested parties are able to view

proprietary information of other parties under an APO, there is no administrative protective order

procedure in place for EAPA investigations.  Pursuant to Customs' regulations, public versions

of EAPA submissions must "contain a summary of the bracketed information in sufficient detail

to permit a reasonable understanding of the substance of the information."  19 C.F.R.

§ 165.4(a)(2).  Put another way, public summaries must allow a reader that can only access the

public version — which includes both the responding importer and the alleger — to understand

what is being submitted.  It does not require disclosure of numbers, detailed processes, or

calculations.  Minh Phu fully complied with Customs' regulations in this regard, and provided

public summaries in the public versions of its submissions that permit a reasonable

understanding of the substance of the submission.

In its brief before this Court, AHSTEC does not make any new arguments regarding

Minh Phu's public submissions.  Instead, it simply repeats its complaint that (a) Minh Phu's

submission were over-bracketed (that is, they treated too much information as proprietary) and

(b) because there were "thousands of blank pages Minh Phu submitted as public versions of the

company's filings, the record review conducted by ORR to determine whether substantial

evidence supported TRLED's determination of evasion was entirely dependent on ORR."  ECF

No. 33 at 34.  We address each of these points in turn.

First, in order to protect its business confidential information, including trade secrets and

financial information, Minh Phu bracketed as much as was necessary to ensure that no

information that was confidential was inadvertently disclosed.  Nonetheless, Minh Phu inserted

thousands of separator pages into its exhibits and provided detailed narrative responses in its

public versions, to allow parties who only could see the public versions the required "reasonable

understanding" of the substance of the information being provided.  AHSTEC appears to have

had enough of a "reasonable understanding" of the substance of the information redacted from

Minh Phu's submissions, to be able to argue about whether specific information in those

submissions should be treated as public.  Therefore, it is evident that Minh Phu submissions fully

complied with the requirements of the regulations.

AHSTEC cites to *Royal Brush v. United States*, 483 F. Supp. 3d 1294 (Ct. Int'l Trade

2020) (*Royal Brush I*) in an attempt to support its claim that Minh Phu's public summaries

should have been more extensive.  ECF No. 33 at 32.  In *Royal Brush I*, TRLED found, and ORR

confirmed, a finding of evasion against Royal Brush, the accused importer.  On appeal, Royal

Brush argued that Customs' failure to provide public summaries of the information redacted

from the Attaché Report and the Verification Report deprived Royal Brush of due process.

*Royal Brush I* at 1307.  The Court agreed, finding that Customs failed to afford Royal Brush the

opportunity to be heard at a meaningful time and in a meaningful manner.  *Id.*  More specifically,

the Court held that "to comply with due process, Customs' procedures must afford adequate

opportunity for importers to respond to the evidence used against them."  *Id.* at 1306.  Because

the Attaché Report and Verification Report included information used against it, Royal Brush

should have been afforded public summaries in sufficient detail to allow it to respond to that

information.  *Id.* at 1307.  The Court clarified that Royal Brush was so entitled because importers

whose access to foreign commerce would be impaired as a result of an administrative proceeding

have a procedural due process right to notice and a meaningful opportunity to be heard in that

proceeding.  *Id.* at 1305-06 (citing *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751,

761-62 (Fed. Cir. 2012)). Put another way, interim measures imposed on accused importers in EAPA proceedings and the continuation of those punitive measures are deprivations that require due process. Customs however does not impose punitive measures on allegers in EAPA proceedings and therefore the same due process concerns are not implicated.

AHSTEC fails to acknowledge the fact that *Royal Brush I* related to an accused *importer's* entitlement to due process in light of the deprivations imposed by punitive measures against the importer in EAPA proceedings. While in *Royal Brush I* the accused importer did not have sufficient access to the information used against it to inflict punitive measures, no measures were taken against AHSTEC in this case. Because AHSTEC is not the accused importer — it is the alleging party — no measures have been taken against it throughout the course of the proceeding, so any lack of access to information would in no way constitute a violation of its right to due process. As such, the only "right" it has to have access to any of the information is the public disclosure language in the regulations, of which the standard, as previously noted, is whether the disclosed information conveys a reasonable understanding of the substance of the non-disclosed information.

Critically, AHSTEC does not explain how it was harmed by the alleged failure of Minh Phu to properly summarize or otherwise disclose the information it treated as confidential. As this Court has recently held in the second appeal of *Royal Brush*, a demonstration of actual harm is required in any due process challenge. *See Royal Brush v. United States*, Court No. 19-00198 (Ct. Int'l Trade Oct. 29, 2021) (*Royal Brush II*). In *Royal Brush II*, Royal Brush again challenged the sufficiency of the public summaries provided to it on remand and claimed that due process required the full disclosure of certain information. *Id.* However, after determining that Royal Brush did not specify the nature of the private right that it sought to protect, the Court

held that Royal Brush had not established that Customs' failed to provide it with due process. *Royal Brush II*, slip op. at 20.  The Court explained that to determine whether administrative procedures provided in a given case are constitutionally sufficient, the Court considers:  (1) the private interest that will be affected by the administrative action; (2) the risk of erroneous deprivation of such interest through the procedures used, as well as the probative value of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burden the safeguards would entail.  *Id.* at 13 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  Because Royal Brush, did not make any arguments with respect to the first and third factors, *id.*, and its pleading of the second factor did not specify the harm, the Court held that the importer failed to show that due process required Customs' disclosure of the requested information.  *Id.* at 19.  Similarly, not only has AHSTEC not specified the harm it suffered without access to Minh Phu's confidential information, but it also did not even explain what its interest is in the information or consider the administrative or fiscal burden that requiring Minh Phu to make public its confidential information would entail.  In such circumstances, AHSTEC has failed to state a claim on due process grounds.

Furthermore, as discussed above, AHSTEC has not explained in what way the public summaries were not in compliance with Customs' regulations.  Instead, AHTEC merely stated that it raised "specific, detailed concerns regarding both Minh Phu's claims regarding what constituted business confidential information in the company's submissions and the adequacy of the public summaries submitted."  ECF No. 33 at 32.  AHSTEC overlooks Minh Phu's public narrative responses that explained in detail the documents contained in the exhibits, as well as the thousands of separator pages that explained the information contained therein.  In addition, AHSTEC fails to note the contradiction inherent in its argument:  the fact that it can make

"specific, detailed claims" concerning whether certain information should be confidential demonstrates on its face that Minh Phu's summaries were sufficient to understand what was being submitted.

AHSTEC complains about the fact that "thousands of blank pages" caused ORR to be the sole decision maker.  In doing so, AHSTEC demonstrates a misunderstanding of how EAPA proceedings actually operate.[4]  In EAPA proceedings, TRLED makes the initial determination as to evasion, not the alleging party.  In EAPA administrative reviews, ORR, not the alleging party, conducts a *de novo* review of TRLED's determination.  An alleging party is not entitled to view the confidential versions of submissions, and is not entitled to see all information regarding a party's shipments and processes, pursuant to EAPA regulations.  There is no requirement under the statute or the regulations for all information refuting an allegation of evasion to be public, as AHSTEC seems to believe.  Customs is the finder of fact and examines the submitted materials — allegers can comment on the materials submitted, but are not entitled to a complete record.[5] Moreover, allegers already have sole access to TRLED for more than 100 days before the subjects of the allegation are even notified of its existence.  The question is whether Minh Phu complied with CBP's regulations and provided public versions that gave AHSTEC a reasonable understanding of the substance of the information submitted.  The detailed public narrative descriptions in each submission, along with the separator pages identifying the information redacted as proprietary demonstrate that Minh Phu complied with the requirements of the statute

---

[4] As noted repeatedly, the "thousands of blank pages" (from which proprietary information was deleted) were separated by divider pages that summarized information on each interstitial blank page.  It is, therefore, unclear how AHSTEC did not have a reasonable understanding of the substance of the information, pursuant to 165.4(a)(2).  It should be noted that the volume of pages is the result of the sheer volume of data requested and submitted in spreadsheets.

[5] Prior to the 1979 Trade Act, parties before the US Department of Commerce and the US International Trade Commission similarly provided no access to confidential data in trade proceedings to petitioning or responding parties.

and regulations.  The fact that AHSTEC would prefer to have more details revealed to it is of no moment.

## VI.    CONCLUSION

In light of the forgoing, we respectfully request that the Court hold that ORR's decision was not arbitrary, capricious, or an abuse of discretion and affirm the ORR determination that Minh Phu was not evading the antidumping duty order on Shrimp from India.

Respectfully submitted,

/s/ Donald B. Cameron
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Defendant-Intervenors Minh Phu*
*Seafood Joint Stock Company and*
*MSeafood Corporation*

William H. Barringer
3900 Watson Place, N.W.
Washington, D.C. 20016

*Legal Advisor to Minh Phu Seafood Joint*
*Stock Company and MSeafood Corporation*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 13,706 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

**/s/ Donald B. Cameron**